GENERAL METALS, INC., Plaintiff,

v.

The GREEN FUEL ECONOMIZER CO., Inc., Defendant and Third-Party Plaintiff,

v.

SEABOARD SURETY COMPANY, Third-Party Defendant.

Civ. No. 11846.

United States District Court
D. Maryland.

Jan. 28, 1963.

---

7. 301 U.S. 278, at 287, 57 S.Ct. 705, at 709, 81 L.Ed. 1085.

8. See also Halpert v. Engine Air Service, Inc., 212 F.2d 860, 862–863 (2d Cir., 1954).

9. 278 F. 707, at 710.

Edward C. Bell, Hyattsville, Md., and John L. Kilcullen, Washington, D. C., for plaintiff.

Hilary W. Gans, Baltimore, Md., Byron N. Scott and Frank S. Ketcham, Washington, D. C., for defendant.

John L. Kilcullen, McNutt, Dudley & Easterwood, Washington, D. C., Edward C. Bell, Hyattsville, Md., of counsel, for third-party defendant.

THOMSEN, Chief Judge.

This is an action by a second-tier subcontractor, General Metals (plaintiff), against the first-tier subcontractor, Green Fuel (defendant), in which plaintiff claims that defendant unjustifiably terminated the contract between them, thus

entitling plaintiff to its costs incurred, which amount to more than $200,000. Defendant has filed a counterclaim against plaintiff and a third-party claim against its surety, Seaboard, based upon the failure of plaintiff to complete the contract. Defendant claims that as a result of that failure the principal contractor, Blount Brothers Construction Co. (Blount), terminated defendant's subcontract and defendant paid Blount $250,000 in settlement of Blount's suit against defendant.

The parties have agreed that the question of liability should be tried first before the Court without a jury, and that the exact amount of any damages either side might be entitled to collect from the other shall be determined later.

### The Contract

On December 15, 1955, the United States and Blount entered into a contract under which Blount undertook to furnish all labor and materials and perform all work required for the construction of a 36-inch variable pressure water tunnel, at the David W. Taylor Model Basin, Carderock, Maryland, in accordance with the specifications, schedules and drawings prepared by the Department of the Navy, which was designated as architect and engineer. On the same day Blount subcontracted to defendant that part of the general contract dealing with the resorber pit lining and tunnel shell, the latter term includes all the work covered by the subcontract between defendant and plaintiff. The original date for completion of the principal contract was March 1, 1957, but the time was extended by Blount. Defendant itself performed all the work connected with the resorber pit,[1] but by the fall of 1956 had been unable to fabricate the tunnel shell through its own efforts or those of the

second-tier subcontractors theretofore employed.

On September 24, 1956, defendant issued a purchase order to plaintiff for that part of the tunnel shell known as the contraction assembly. Plaintiff was not equipped to handle such heavy work; so, immediately after receiving the purchase order from defendant, plaintiff issued a purchase order for the contraction assembly to Truitt Manufacturing Company (Truitt), which thus became a third-tier subcontractor. The purchase orders required that the work be completed by December 30, 1956.

In November 1956 defendant asked plaintiff to bid on the entire tunnel shell and supports, except the test section, which was being constructed by others.[2] The contract which is the subject of the instant case was dated December 27, 1956, and was executed by both parties within a day or two thereafter.

The work which plaintiff undertook under that contract included the fabrication of: the contraction assembly, which carried the water into the test section, the previous purchase order being superseded by the contract; three diffuser section assemblies; three cylindrical section assemblies; four elbow assemblies, including numerous guide vanes (turning vanes) assembled in elliptical rings, the purpose of which was to eliminate or minimize the turbulence of the water flowing through the tunnel; eighteen flanges, to be welded onto various assemblies; and various minor items not material in this case.

Delivery under the contract of December 27, 1956, was to be made so that erection could start on March 5, 1957, and be completed on June 1, 1957. The contract price was $233,500. The contract contained most of the provisions usually found in construction subcontracts, of

---

1. This work included the connections with the tunnel shell known as the "upcomer" and "downcomer."

2. At the same time plaintiff was seeking to obtain a larger subcontract from de-

fendant for the wave maker at Carderock, and defendant insisted that plaintiff agree to take the tunnel shell subcontract before defendant would award it the wave maker subcontract.

which those set out in the margin[3] are material in this case.

3. Provisions From Contract Between Plaintiff and Defendant:

(Plaintiff is referred to therein as "Subcontractor", defendant as "Contractor.")

"Article I—Sub-Contractor shall furnish all labor and materials and perform all work necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of the Contractor, and all work incidental thereto, namely:

"Article III—(a) Sub-Contractor shall begin work as soon as instructed by Contractor, and shall carry on said work promptly, efficiently and at a speed that will not cause delay in the progress of Contractor's work or other branches of the work carried on by other sub-contractors. * * *

"(b) Any damages for delay caused by Sub-Contractor shall be deducted by Contractor from the agreed price for said work as liquidated damages and not as a penalty, subject, however, to the option of the Contractor to terminate said employment for default as herein elsewhere provided.

"(c) Contractor shall not be liable to the Sub-Contractor for delay to Sub-Contractor's work by the act, neglect or default of the Owner, or the Architect or by reason of fire or other casualty, * * * or any other cause, beyond the Contractor's control; but Contractor will cooperate with Sub-Contractor to enforce any just claim against the Owner or Architect for delay.

"(d) Should Sub-Contractor be delayed in his work by Contractor, the Contractor shall owe Sub-Contractor therefor only an extension of time for completion equal to the delay caused and then only if a written claim for delay is made to Contractor within forty-eight hours from the time of the beginning of the delay.

* * * * *

"Article IV—Sub-Contractor shall make all alterations, furnish the material for and perform all extra work or omit any work Owner or Architect may require, * * * No changes are to be made, however, except upon written order from the Contractor and Contractor shall not be held liable to Sub-Contractor for any extra labor, materials, or equipment furnished without such written order. The amount to be paid by Contractor, or allowed by Sub-Contractor, by virtue of same, shall be stated in such order, if the amount can be agreed upon, but if not, then it shall be fixed by arbi-

The fabrication of the contraction section, which tapered in a reverse curve, tration as provided in Article XI, but meanwhile the work shall proceed as directed.

"Article XIII—(a) Should Sub-Contractor at any time breach this agreement, or fail to prosecute the said work with promptness, diligence and efficiency or fail to perform any of the requirements hereof, Contractor may without notice, (or if notice be required by Law, then after twenty-four hours written notice either by registered mail addressed to Sub-Contractor at Greensboro, North Carolina, or by posting in some conspicuous place on the job), proceed as follows:

"1. Provide such materials, supplies, equipment and labor as may be necessary to complete said work, pay for same and deduct the amount so paid from any money then or thereafter due Sub-Contractor, or

"2. Terminate the employment of Sub-Contractor, enter upon the premises and take possession, for use in completing the work, of all the materials, supplies, tools, equipment and appliances of the Sub-Contractor thereon and complete the work, or have same completed by others and be liable to Sub-Contractor for no further payment under the agreement until final payment is due and then only if and to the extent that the unpaid balance of the amount to be paid under this Sub-Contract exceeds the expense of the Contractor in finishing the work.

"(b) If the amount expended by Contractor under '1' above, or the cost of completing the work under '2' above, exceeds the unpaid balance of sub-contract price herein stated, Sub-Contractor shall pay Contractor such excess.

* * * * *

"(d) Should Sub-Contractor default in any of the provisions of this sub-contract and should Contractor employ an attorney to enforce any provision hereof, or to collect damages for breach of the sub-contract, or to recover on the bond mentioned in Article XII, above, Sub-Contractor and his surety agree to pay Contractor such reasonable attorney's fees as he may expend therein. As against the obligations herein contained Sub-Contractor and his surety waive all rights of exemption."

Paragraph 10 of the Rider attached to the contract contains a list of materials headed:

"Raw materials to be furnished by the Green Fuel Economizer Co. to the contractor for fabrication."

would have been very difficult at best; it was rendered nearly if not absolutely impossible by the close tolerance of two hundredths of an inch (.020″) required for the inside surface.[4] The fabrication of the elliptical rings, into which the turning vanes were welded, was rendered absolutely impossible by the unreasonable tolerance of .010″.[5] This tolerance was later relaxed by the Navy to .125″, but too late to benefit either plaintiff or defendant.[6]

A rider attached to the contract of December 27, 1956, contained a list of "raw materials to be furnished by [defendant] to [plaintiff] for fabrication."[7] Plaintiff claims that its performance of the contract was delayed and prevented by the failure of defendant to deliver those materials promptly, and, more importantly, by the unsuitability of those materials for the work to be done.

■ Plaintiff also contends that Gordon, who negotiated the contract for defendant, falsely represented to plaintiff before the contract was executed, that the tolerances would be relaxed and that the materials to be supplied by defendant would be suitable for the work. Defendant objected to the testimony offered by plaintiff to that effect, as a violation of the parol evidence rule. The Court has admitted the testimony, not to vary the terms of the written contract, but as evidence in support of plaintiff's contention that defendant's counterclaim should be disallowed because the contract was obtained by false representations and concealment amounting to fraud.

*Chronological Statement*

Plaintiff did not intend to perform in its own shop any part of the work covered by the contract of December 27, 1956. On February 22, 1957, it gave a purchase order to Truitt for all the work covered by that contract, including fabrication of the contraction assembly, which had been the subject of plaintiff's September 1956 purchase order to Truitt. Delivery under the new purchase order was to be made in May 1957.

The material necessary for the contraction assembly had been ordered by plaintiff in November 1956 and was received by Truitt late in December 1956. A few days later Truitt started work on the contraction section. The other material required to perform plaintiff's contract, except that to be furnished by defendant under the rider, was purchased by plaintiff as needed.

Immediately after the February 1957 purchase order to Truitt was issued, plaintiff notified defendant to ship to Truitt the material which defendant was obligated to supply under the rider. That material was delivered over a period of about a month. It included the carbon steel for the flanges, and the ⅜″ stainless steel plates from which the turning vanes were to be fabricated. Plaintiff's claims that both items were unsuitable will be discussed separately below. Truitt began to work on the flanges early in April; shortly thereafter it began work on the turning vanes, in each instance using the material supplied by defendant. Neither Truitt nor plaintiff was delayed in the

4. As one witness put it, watchmaker tolerances were being required for a steel tunnel.

5. The heat of welding the vanes into the elliptical rings would necessarily distort properly fabricated vanes beyond the specified tolerance.

6. Both plaintiff and defendant sought permission from Blount and the Navy to inspect the tunnel as finally completed in April 1959, by another subcontractor of Blount. This permission was refused, and the Court infers that either

the Navy or Blount or both had something to hide, probably that the tolerance for the contraction section had not been met and had been waived or overlooked, or that some change in the original plans with respect thereto had been made. At that time Blount had a suit pending against defendant and probably had conditional claims against the Navy.

7. The rider also listed certain appurtenances and/or assemblies to be furnished by others for attachment to the items covered by plaintiff's contract.

performance of the work because defendant did not deliver the materials sooner, but they were delayed because of the unsuitability of the material supplied by defendant for the flanges and for the turning vanes. Truitt found it impossible to fabricate the ⅜″ turning vanes from the ⅜″ steel plates, because the necessary machining reduced the thickness thereof. Truitt also was unable to fabricate the contraction section to the .020″ tolerance specified.

In April, May and June 1957 defendant urged plaintiff to proceed faster. On July 26 plaintiff and Truitt submitted a schedule calling for completion of the job on November 22. This was unacceptable to defendant, which was under pressure from Blount. On July 30 defendant urged plaintiff to give part of the work to another subcontractor. Although plaintiff protested that Truitt was thoroughly capable, plaintiff had found it necessary to send to the Newport News Shipbuilding & Drydock Company the contraction assembly which had been fabricated by Truitt, so that Newport News could do additional machining thereon in an effort to make it comply with the specifications. On July 30 plaintiff gave another purchase order to Newport News for additional work on other items. On August 6 Truitt wrote plaintiff that he could not make the turning vanes from available material and by the method of fabrication he had been forced to use.

On August 7 plaintiff terminated its February 22 contract with Truitt, and two days later made a new contract with Truitt covering only the completion of the contraction and diffuser sections. Under the new agreement the contraction section was to be delivered on August 23 and the diffuser section on September 23. The balance of the work on the tunnel shell (with the exception of the work being done on the flanges by Newport News) was turned over to Littleford Brothers at the insistence of defendant.

On October 4 Littleford notified defendant that it could not make the vanes. It had done no work on any other part of the contract.

On October 22 plaintiff signed a contract with Southern Engineering Company, to be effective only if the Navy, Blount and defendant approved Southern as a third-tier subcontractor. Plaintiff and defendant asked for this approval. On November 1 Blount demanded additional information about Southern. The matter dragged out during November. After a conference between Blount and Southern, Southern cancelled its contract with plaintiff on December 6. Apparently this was not reported to defendant or Blount, for Blount gave conditional approval of Southern on December 26. Finally, on January 22 plaintiff told defendant that Southern had cancelled.

Meanwhile, on October 31 and November 14 plaintiff had again requested defendant to supply thicker material for preparing the vanes, and on November 18 defendant had authorized plaintiff to order the material itself, but reserved the question of who should pay for it. This material was never ordered. In November plaintiff sent a mass of other material to Southern, on which no work was ever done because Southern cancelled its contract with plaintiff before it became effective.

On November 8 and 19, 1957, and again on January 27, 1958, plaintiff submitted to defendant status reports showing what had been done on each item of the work. No item had been completed. In January 1958 plaintiff had no subcontractor working on some of the sections. On February 2 defendant wrote plaintiff as follows:

"The Navy has advised that this contract is in default and that the work is essential to the Defense Effort. Unless you give us, by noon, Tuesday February 5, 1958, the name of the Subcontractor to whom you propose to let the cylinder sections, elbows, vanes and vane assemblies and assure us that you will proceed to contract for that work at once upon approval of the Subcontractor, we will be forced to declare you in

default of your Subcontract and terminate same under Article XIII thereof; and proceed to Subcontract this portion of the work to another fabricator."

Under protest from plaintiff defendant was willing to extend for two or three days only the time for plaintiff to submit the name of a proposed subcontractor for the balance of the work. When plaintiff failed to do so, defendant, on February 8, 1958, terminated the contract. No payments were ever made to plaintiff by defendant.

### Contentions of the Parties

Plaintiff contends that defendant wrongfully terminated the contract, arguing that defendant had delayed and prevented its performance, entitling plaintiff to extensions carrying the time for its performance beyond the termination date. Plaintiff claims: (A) delays caused by defendant's failure to supply promptly the materials listed in the rider to the contract; (B) delays caused by the unsuitability of much of the material so supplied and defendant's insistence that plaintiff use that material; (C) delay caused by defendant's insistence that most of the work be turned over to Littleford in August, 1957; (D) delay caused by Blount's failure promptly to approve Southern as a third-tier subcontractor and Blount's statements to Southern causing Southern to cancel its contract. Plaintiff also claims (E) that termination of the contract by defendant was not justified, and (F) that defendant's counterclaim is barred by defendant's false representations and concealment at the time the contract of December 27, 1956 was entered into and later. Plaintiff does not claim any damages based upon fraud, or upon the delays as such, but contends that the delays prevented its performance, so that defendant's termination of the contract was unjustified and amounted to a breach of the contract.

Plaintiff relies on the familiar principle that each party to a contract has a duty not to hinder or delay the other party in the performance of the contract. 12

Am.Jur., Contracts, § 351; 3 Corbin on Contracts § 571. Defendant denies the applicability of that principle in this case, because Art. III(d) of the contract provided that if plaintiff were delayed in its work by defendant, defendant should owe the plaintiff therefor "only for an extension of time for completion equal to the delay caused". To support this argument defendant cites Brooker Eng. Co. v. Grand River Dam Auth., 10 Cir., 144 F. 2d 708, and Psaty & Fuhrman v. Housing Authority, 76 R.I. 87, 68 A.2d 32, 10 A.L.R.2d 789. Those cases hold that under such a contract no damages may be recovered for delays, but they do not support the proposition that plaintiff may not show that its performance was prevented by acts or defaults on the part of defendant. In the case at bar plaintiff is not seeking damages for the delay as such, but does charge that defendant's specified acts and defaults prevented plaintiff's performance.

Plaintiff also contends that defendant impliedly warranted that the materials which it supplied were unsuitable for the purposes for which they were furnished, citing authorities applicable to sales and one government contract case, Topkis Brothers Company v. United States, Ct.Cl., 297 F.2d 536. Defendant rightly argues that the sales act does not apply, and that Topkis is distinguishable because in that case there was an express warranty of suitability. Nevertheless, when a contract provides that a second-tier subcontractor will perform certain work and that the first-tier subcontractor will supply specified materials to be used in the work, the latter impliedly promises or undertakes that the materials will be suitable, unless it is apparent on the face of the contract that the materials do not meet the specifications or are otherwise unsuitable. See Ekco Products Co. v. United States, Ct. Cl., 312 F.2d 768.

Such unsuitability does not ipso facto relieve the second-tier subcontractor, in this case the plaintiff, from its duty to perform the contract. Various factors must be considered, such as plain-

tiff's diligence or lack of diligence in discovering the defects and in taking steps to remedy them, the repeated insistence by defendant that the materials were suitable, and its refusal for a long time to agree that plaintiff should purchase other material. It will therefore be necessary to consider the several items in detail.

### A. Defendant's Alleged Delay in Delivering Materials.

On December 27, 1956, the materials which defendant was called upon to deliver to plaintiff under the rider were in the hands of defendant's former second-tier subcontractors. Defendant had to settle with them before the material could be shipped to plaintiff. But plaintiff did not intend to do any of the work itself and did not want the material shipped to its plant; it gave no shipping instructions to defendant until February 22, 1957, the date of the purchase order plaintiff gave to Truitt. The materials were delivered promptly thereafter. Truitt had been working on the contraction assembly, and was not delayed in its work by any late delivery of the material covered by the rider.

Plaintiff was not entitled to any extension of time because of delay on the part of defendant in delivering that material.

### B. Unsuitability of Material Supplied by Defendant.

#### 1. Carbon Content of Material for Flanges.

In the invitation to bid which defendant sent to plaintiff was a list of the material to be furnished by defendant. That list included certain carbon steel plates, which were to be formed into flange rings and welded onto the outer surface of the stainless steel tunnel sections. The carbon steel plates were described as "ASTMA–235–55 Class Fl, Normalized & Tempered." The reference was to the 1955 specifications of the American Society for Testing Materials. The same description appeared in the rider to the December 27, 1956 contract. However, in the specifications which were made a part of that contract (Navdocks Spec. 45073 and addenda) the corresponding reference was to the 1952 ASTMA specifications. The 1955 ASTMA specifications permitted a higher carbon content than the 1952 specifications, although plaintiff's Executive Vice President Hornig testified that he did not see any material difference between the list and the contract specifications.

When Truitt began to weld the carbon steel onto the stainless steel, cracks appeared in the welding, as a result of the high carbon content. Some three weeks experimentation was required before a satisfactory welding method was developed. The high carbon content did not render the flanges unacceptable to the Navy, provided they were properly welded.

Defendant was at fault in furnishing carbon steel plates which did not meet the specifications of the principal contract, i. e. Navdocks specifications. On the other hand, plaintiff and Truitt should have noticed the discrepancy between the rider and those specifications before the welding was begun. All facts considered, I find that plaintiff was entitled to an extension of three weeks because of the high carbon content of the flange material supplied by defendant.

#### 2. J-Grooves

The plates for flange rings supplied by defendant were supposed to contain grooves in the general shape of the letter J, as shown on certain approved shop drawings, to accommodate the welding material. The plates actually supplied by defendant contained J-grooves which were too short; the lands between the welds were too long, and the specified type of weld could not be obtained. Truitt noticed that the J-grooves were too short when the plates were received from defendant's materialman, but since the plates bore the Navy stamp, an anchor in a circle, Truitt assumed that the grooves had been approved and went ahead with the welding of thirteen flanges and the tack-welding of five others. It was necessary to send the flanges to Newport News to have the

welds removed and the grooves lengthened in accordance with the shop drawings. Five of the flanges could not be salvaged and new material had to be bought.

Here again, both sides were at fault, defendant for supplying unsuitable material, and Truitt, for whom plaintiff is responsible, for not checking further into the matter before doing so much welding. No doubt, as plaintiff contends, both Truitt and plaintiff were under pressure to speed up the work, and were loath to delay the welding until the situation could be clarified. But plaintiff and Truitt could have minimized the difficulties by checking on the matter more promptly, and by welding only those flanges which were immediately needed until such clarification was obtained.

Plaintiff claims that it is entitled to a three month extension because of the delay involved. I find that the remachining at Newport News could have been accomplished in a few weeks, at most.

Although both sides were at fault, the first fault was defendant's, and it seems fair to allow plaintiff an extension of one month for this item.

### 3. *The Turning Vanes*

The specifications of the principal contract, made part of the contract between plaintiff and defendant, required the turning vanes to be ⅜″ thick with a tolerance of .020″, and required that they be welded into elliptical rings, for which a tolerance of .010″ was specified. As noted above, the extremely high heat required to weld the stainless steel vanes into the rings necessarily distorted the vanes, and prevented the resulting assembly from meeting the specified tolerance of .010″.

This was apparent to both plaintiff and defendant when they entered into the contract of December 27, 1956. Moreover, it was or should have been apparent to both of them that it would be practically impossible to fabricate the ⅜″ vanes from the ⅜″ stainless steel plates, which defendant undertook to furnish both in the invitation to bid and in the rider to the contract, because the fabrication of the vanes required machining which was likely to reduce the thickness of some portion of each vane. Hornig, plaintiff's vice president, testified that Gordon, who negotiated the contract for defendant, assured him just before the contract was executed that the specifications would be relaxed and that all the material to be supplied by defendant would be suitable for the work. This testimony was not admissible to vary the terms of the contract, although it was admitted for other purposes. After many months of effort on the part of Truitt and Littleford to achieve the specified tolerances, defendant and Blount, on October 15, 1957, requested the Navy to relax the tolerances. The .010″ tolerance for the rings was relaxed by the Navy to .125″ on January 16, 1958, but no change in the .020″ tolerance for the vanes was made.

About May 1, 1957, Truitt had fabricated a sample vane which was close to the specified tolerance but did not quite meet it. Defendant took the sample to Carderock, where it was examined by the Navy inspectors. Truitt testified that Hipwell, defendant's project engineer, told him over the telephone on May 6 that the Navy had approved the sample, and directed Truitt to proceed with the fabrication of the vanes. This is disputed by defendant, and the evidence as a whole leaves the matter in some doubt. I find that Truitt had already started to fabricate the vanes from the material supplied by defendant; that Hipwell told Truitt that the Navy was going to approve the vanes and directed Truitt to continue; that Truitt did continue until he learned on May 28 that the Navy had not approved the sample vane; and that by May 28 Truitt had fabricated most if not all of the nose and tail bars and had used up practically all of the material which had been supplied for machining those items. On May 16 defendant had sent plaintiff another drawing of the nose and tail pieces, and on May 28 again insisted that the vanes could be fabricated in accordance with the specifications and directed plaintiff to

proceed with the machining of the nose and tail pieces. Truitt must have started work on the nose and tail pieces before May 6 or continued it after May 28, probably both; it was not possible for Truitt to have fabricated all of them between those two dates with the equipment it was using.

Neither Truitt nor plaintiff requested a change order relaxing the tolerance or any formal approval of the sample vane before fabricating all the rest of the nose and tail pieces.

Early in the summer plaintiff asked defendant to supply thicker plates for the fabrication of the vanes, but defendant continued to insist that plaintiff use the material defendant had supplied, and early in August told plaintiff that Littleford would guarantee the fabrication of the turning vanes with the available materials and within the contract tolerances. Since Truitt admitted, on August 6, its inability to do this, plaintiff, at the insistence of defendant, sent the material to Littleford. After two months, on October 4, Littleford notified defendant that it was abandoning any further efforts to fabricate the vanes.

On October 31 and again on November 14, plaintiff asked defendant to supply additional material from which plaintiff might fabricate the nose and tail pieces, and on November 18 defendant authorized plaintiff to purchase the necessary material, reserving to a later date the decision as to who should pay for it. But from October on, plaintiff had no approved third-tier subcontractor willing to undertake this work.

Plaintiff says in its brief: "The responsibility of maintaining the vane assembly tolerance is not asserted by plaintiff as an excuse for non-performance of the contract, but rather as a factor which contributed to the delay."

Once again, there is something to be said on both sides. Defendant is to blame for sending unsuitable material, for delaying so long its request for a relaxation of tolerances, and for the Littleford fiasco. On the other hand, plaintiff allowed Truitt to proceed with work which it knew or should have known could not be performed in accordance with the existing specifications, and after Southern decided not to proceed, had no means and found no means of performing this part of the work, even after the tolerance for the rings was relaxed in the middle of January 1958. Both parties are somewhat to blame for the time wasted in machining the nose and tail pieces in May 1957, whatever misstatement with respect to Navy approval may have been made.

All factors considered, the unsuitability of the material supplied by defendant for the turning vanes entitles plaintiff to an extension of four months, including the two months which passed while Littleford was supposed to be fabricating the vanes.

#### C. *Littleford*

The two months lost by the Littleford fiasco has been included in the four months allowed in connection with the turning vanes. See B3, immediately above.

#### D. *Southern*

The evidence does not show that there was any unreasonable delay on the part of Blount and the Navy in approving Southern as a third-tier subcontractor, nor for the refusal of Southern to go ahead with the contract which it had made with plaintiff.

#### E. *Termination of Contract—Facts and Law*

Defendant terminated plaintiff's contract in February, 1958, pursuant to Article XIII(a) thereof, which permitted such termination if plaintiff should "at any time breach this agreement or fail to prosecute the said work with promptness, diligence and efficiency or fail to perform any of the requirements" thereof. See note 3 supra.

Plaintiff contends that although it was required by the terms of the contract to complete its work by June 1, 1957, it was prevented from doing so by various acts of defendant, some of which amounted to breaches of the contract, and all of which entitled plaintiff to extensions

which carried the time for such performance well beyond February, 1958. As appears from the discussion of plaintiff's points, A, B1, B2, B3, C and D, above, plaintiff was entitled to a total extension of about six months, or until December 1, 1957.[8] Although no formal extension was given, defendant waived the requirement of Article III(d) that claims for delay be in writing, and in effect gave plaintiff an extension until February, 1958, when defendant terminated the contract. Even if plaintiff had been entitled to an extension of as much as ten months, which would have carried the time for performance to April 1958, defendant would still have been entitled to cancel the contract in February under Article XIII(a), because plaintiff had not then completed any item of the contract, and was not itself, or through any third-tier subcontractor, doing anything to complete a number of the items, including the turning vanes and elliptical rings in the four assemblies.

In opposition to this conclusion plaintiff cites the general principle stated in 12 Am.Jur. Contracts, Sec. 438, as follows: "A party who has substantially broken the contract cannot rescind it on the ground that the other party subsequently refuses or fails to perform. A tender of performance is necessary to acquire a right of restitution. The rule that a rescission of a contract by one party thereto, without the consent of the adverse party, cannot be made except by one who is not in default applies where the obligations on which each party is in default are dependent and concurrent or where the rescinding party's default is so related to the obligation in which the adverse party has failed that it, in some manner, affects performance or the duty of the latter to perform." See also Shriver Oil Company v. Interocean Oil Company, 157 Md. 341, 146 A. 223. But

plaintiff had undertaken, as a second-tier subcontractor, to perform and complete a large part of the work covered by defendant's contract with the principal contractor, and the latter had obligations to the Navy. Under those circumstances plaintiff could not sit idly by and claim that defendant had no right to terminate its contract merely because defendant had delayed plaintiff's performance by supplying certain materials which were unsuitable for the work, especially since the unsuitable material represented only a small part of the total material required.

In the instant case the contract and rider did not provide for what should be done if some of the material supplied by defendant for fabrication by plaintiff was unsuitable. Although defendant was at fault in insisting that plaintiff use the unsuitable material and in waiting until the middle of November to authorize plaintiff to purchase other materials, I conclude that plaintiff should have purchased other suitable materials not later than November 1957. It never purchased such materials.

■ Plaintiff seeks recovery of the various amounts paid by it to Truitt and to Newport News, the cost of certain material purchased by plaintiff, and several minor items. However, as stated in 4 Corbin on Contracts, Sec. 947: "One who sues for damages, alleging as a breach the prevention or hindrance by the other party must prove that the condition on which his rights depended would have occurred or been performed but for the prevention or hindrance." See also 3 Williston on Contracts, Rev.Ed., Sec. 884; Cone v. Pederson, 131 Conn. 374, 40 A.2d 274, Boomhower, Inc. v. Lavine, D.D.C., 151 F.Supp. 563.[9]

Plaintiff had been unable to produce a contraction assembly which met the

8. Three weeks for the high carbon content in the flange material, one month for the short J-grooves, and four months for the unsuitable material supplied for the vanes, including the two months wasted with Littleford.

9. Sections 315(2), 463 and 468 of the Restatement, Contracts, have been helpful in their statement of general principles applicable to various phases of this case, which must be viewed in the light of the entire complex of contracts and transactions.

specifications, using materials plaintiff itself had purchased. It had also been unable to produce turning vanes which met the specifications, using the material supplied by defendant. It was impossible to weld the turning vanes into the elliptical rings within the existing tolerances, as plaintiff knew or should have known when it accepted the contract. Plaintiff's reliance on defendant's representations that the tolerances would be relaxed and that the material furnished by defendant was suitable may be a sufficient defense to defendant's counterclaim against plaintiff. But such reliance cannot relieve plaintiff of its obligation to show that it could have performed the contract before it can successfully claim damages for an allegedly improper termination, especially where, as here, plaintiff is not claiming any damages from defendant based on fraud. Plaintiff has not proved that it could have performed the contract.

■ Plaintiff cannot recover on the contract because (1) the termination was not unlawful, (2) plaintiff has not substantially performed the contract or any item thereof, and (3) plaintiff has not shown that it could have performed the contract, apart from the alleged breach.

■ Nor can plaintiff recover on some theory of quasi-contract or quantum meruit, because no part of the work which plaintiff did was of any value to defendant, to the principal contractor, or to the Navy. Plaintiff did not complete any item of the contract in accordance with the specifications. Although plaintiff had purchased certain materials and its subcontractors had done work on some of the sections which might have been used by the new first-tier subcontractor which took over the work when defendant's contract in its turn was cancelled by Blount, plaintiff was never able to reach an agreement with respect to the payment for such materials and work. None of the parties appeared really interested in mitigating the damages.

Plaintiff is not claiming any damages based upon delay as such, nor based upon the alleged fraud. Any claim for damages for delay would be barred by Article III(d) of the contract. See note 3 above.

### F. *Defendant's Counterclaim*

■ On the other hand, defendant is not entitled to recover on its counterclaim, for a number of reasons. In the first place, it induced the plaintiff to enter into the contract by representations (1) that the tolerances would be relaxed and (2) that defendant would furnish to plaintiff materials suitable for the work; whereas defendant (1) had no basis for its representation that the tolerances would be relaxed, and delayed for ten months making any request for such relaxation, and (2) furnished unsuitable material for the turning vanes, all the while insisting that the vanes could and should be prepared from that material. As we have seen, the contract could not be fully performed within the specified tolerances. Defendant's good faith in making the representations is at best doubtful. Defendant misled Truitt and plaintiff by stating on or about May 6 that the Navy had approved the sample vane; that statement was probably reckless rather than deliberately false, as was also the statement that Littleford had stated that it could fabricate the vanes within the specified tolerances using the unsuitable material. Whether deliberate or reckless, the several representations and statements misled plaintiff, and caused it to consume so much time and incur such heavy expenses that it would be unfair to require it also to pay damages to defendant. The law does not permit defendant to recover from plaintiff in such a case as this.

"One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised. One who himself induces the failure of the other to perform within the time agreed upon cannot take advantage of such fail-

ure, either by enforcing a prescribed penalty or forfeiture, or by claiming damages for breach. This is closely related to the rule that in such case he can not use the failure to perform on time as an excuse for his own failure to perform." 3A Corbin on Contracts, Sec. 767.[10]

\*

██ The defaults and lack of diligence on the part of both parties make this a case where neither has met the burden of showing that it is entitled to recover from the other.

G. *The Claim Against The Surety*

This conclusion makes it unnecessary to discuss at length defendant's third party claim against plaintiff's surety and the various affirmative defenses set up by the surety in its answer. It will suffice to make a few findings of fact in addition to those which have been made above. Defendant did not even offer the bond in evidence, but the execution and delivery of the bond was admitted by the surety in its answer. The surety offered no evidence in support of any of its affirmative defenses. The bond contained a provision by which the surety waived notice of extensions of time for performance, and a somewhat unusual provision with respect to the surety's rights after default.[11]

Whether or not notice of default was necessary, cf. New Amsterdam Casualty

Co. v. U. S. Shipping Board, etc., 4 Cir., 16 F.2d 847, defendant gave notice to the surety by sending it a copy of defendant's letter to plaintiff of February 2, 1958, and of the telegram of February 8 terminating plaintiff's contract. The surety did not seek an opportunity to complete plaintiff's contract, and before fifteen days had expired, Blount had cancelled defendant's contract with it on February 16, 1958. Defendant did not prove the provisions of the Standard Form of Arbitration Proceedings of the American Institute of Architects, referred to in the bond,[12] nor did anyone prove that any of the parties either sought or prevented such arbitration.

However, for the reasons which require a judgment for plaintiff (counterclaim defendant) on the counterclaim, judgment must be entered in favor of plaintiff's surety on the third party claim filed against it by defendant.

### JUDGMENT

Judgment is hereby entered in favor of defendant on the claim set out in the complaint, in favor of plaintiff (the counterclaim defendant) on the counterclaim, and in favor of third-party defendant on the third-party claim. Costs will be divided equally between plaintiff and defendant.

10. The general principle quoted from 12 Am.Jur., Contracts, Sec. 438, (See E, above) also supports the denial of defendant's counterclaim, although it does not justify awarding damages to plaintiff.

11. "In event Principal is in default under the contract as defined therein, Surety will (a) within fifteen (15) days of determination of such default, take over and assume completion of said contract and become entitled to the payment of the balance of the contract price, or (b) pay the Owner in cash the reasonable cost of completion, less the balance of the contract price including retained percentage. The cost of completion shall be fixed by taking bids from at least three responsible contractors, one chosen by the Owner, one by the Architect and one

by the Surety. The Surety will make such payment within fifteen (15) days after the cost of completion shall have been so determined."

12. "Provided, however, that unless the aforesaid contract is executed upon The Standard Documents of The American Institute of Architects, it is hereby stipulated and agreed and this bond is executed and delivered upon the condition that all disputes, claims or questions arising under such contract shall be subject to arbitration in accordance with the provisions of Article 40 of the General Conditions of the Contract for the Construction of Buildings contained in the Sixth Edition of such Standard Documents aforesaid, anything to the contrary contained in such aforesaid contract notwithstanding."