**ARMOUR AND COMPANY, a corporation, Plaintiff,**

v.

**R. Stewart SCOTT et al., Defendants.**

**Civ. A. No. 68–1372.**

United States District Court,
W. D. Pennsylvania.

May 10, 1972.

Thomas J. Jackson, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiff, Armour and Co.

David B. Buerger, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendants.

## OPINION

WEIS, District Judge.

### I.

The plaintiff and defendants entered into a contract on August 21, 1967 for the design and construction of a meat processing plant to be located in the City of Pittsburgh. Unlike most building agreements which require the preparation of all plans, drawings, and designs in advance, this was what is called in the trade a "design and build" contract. Its purpose is to allow construction to start while the final drawings and details are being prepared so that work on the detailed engineering plans can proceed during the time that preliminary construction is underway.

In theory, this type of arrangement should permit the work to move more rapidly and result in completed construction at an earlier date. It is obvious, however, that since many details have not been agreed upon by the parties before work begins, that opportunities for error, delay and expensive changes are increased over those not infrequent instances which might be expected in the normal construction contracts.

The defendant partnership had erected a substantial cold storage plant not far from the site of the new projected meat plant, but its construction business was essentially small—almost a one man operation, with John Nard as the active partner in charge. The remaining partners had other interests, including cold storage warehousing, as well as real estate activities, particularly in construction and leasing of shopping centers.

One of the conditions of the August, 1967 contract was that the defendant, as general contractor, would provide performance as well as labor and material bonds. The Urban Redevelopment Authority of Pittsburgh, which had provided the land, had required the furnishing of these bonds but they had not yet been procured by the defendant by November of 1967. The parties thereupon amended the contract to allow the defendant to proceed by virtue of an arrangement whereby the retainage of the contractor would be increased from 5 to 15 percent and the plaintiff, as owner, would agree to act as surety to the Urban Redevelopment Authority.

The plaintiff agreed to these terms despite the fact that memoranda in its file revealed that the particular design which the defendant Nard intended to use was apt to be more expensive than standard construction,[1] that he was not sophisticated in this particular field,[2] and that the only other bid submitted was some two million dollars higher.[3]

Furthermore, the planned completion date had already been seriously compromised although it perhaps was not recognized as such by the parties at that time.

Nard's plan of progress was to lay out the general shell of the building, then commence work in the compressor-mechanical room where the refrigeration equipment and the boilers for the plant would be placed. After that area was substantially complete, he intended to move into the main processing area of the plant installing refrigeration piping and the necessary electrical wiring to power the many machines which would be located there.

A key factor in this plan was the assumption that the refrigeration design would be agreed upon at a very early date in the construction so that such things as the number of compressors and the size of the piping would be fixed. This was necessary so that the more than several miles of pipe could be ordered without delay and placed in position above the projected suspended ceiling which was to be installed at a later date.

If the refrigeration work could not begin at the time planned, revision of the overall strategy would have to be made with expensive and inefficient redeployment of subcontractors, together with the storage problems of large amounts of pipe in areas where craftsmen had to work.

The design and build agreement had incorporated in it numerous drawings prepared by Armour which were more complete than generally obtains in contracts of this nature but were not yet so detailed as to be considered suitable for construction use.

Discussions about the cooling requirement of the refrigeration system had been proceeding for more than a year before the contract and, at least according to one of the refrigeration experts, the loads and main design characteristics had been substantially agreed upon before August 21, 1967. However, the day following the signing of the contract, a meeting was held at which time Armour representatives decided that extensive changes would have to be made in the refrigeration plans. During the course of a series of conferences, the capacity required escalated from approximately 550 tons to the figure which was finally required in the completed building of about 800 tons.

A refrigeration expert testified that had no substantial changes been made by Armour, the work on the design could have been completed within a few weeks of the contract signing date. However, it was not until Feburary 2, 1968, almost six months later, that final approval was secured from Armour and the design drawings for the refrigeration phase began.

Another source of delay was the fact that the preliminary drawings prepared by Armour set out dimensions of a room inadequate to house the boilers which had been specified and consequently that area had to be enlarged during construction.

A key factor in the operation of this plant was the use of hundreds of specially constructed doors. These were extremely heavy, some weighing in excess of 1,000 pounds each, some being electrically operated, heavily insulated and

---

1. Armour memorandum dated May 24, 1966. Defendant's Exhibit 71.

2. Armour memorandum dated September 26, 1967. Defendant's Exhibit 33.

3. Armour memorandum dated April 25, 1969. Defendant's Exhibit 39.

wide enough to accommodate products being moved from one cooling area to another. Numerous changes were required before final approval was secured from Armour on the installation of these doors.

Another very important part of the plant assembly was the electrical system. Many motors were required to be supplied to operate the processing and the refrigeration equipment, in addition to the usual electrical demands in a large modern building. At the time the contract was signed, a list of the projected types of processing equipment and some drawings were supplied to the defendant but final shop drawings for each item of equipment had to be dispatched by the respective manufacturers after the purchase orders had been placed by Armour.

Again, the gap between what had been anticipated in August of 1967 and what was finally delivered to the plant was a substantial one. Some machines were delivered with motors with different phases than those originally contemplated and there were unexpected variations in the power ratings in others as they arrived. Some of the outside dimensions of the machines failed to correspond to the original plans and space adjustments had to be made. Again, these problems caused substantial delay and inefficiency in work scheduling of the subcontractors.

It became apparent as the work progressed that what had originally been planned to be almost a "turnkey" operation had become a de facto type of joint enterprise or partnership arrangement between the Armour engineers and the defendants and their engineers. This did not promote efficiency because the defendants' plans could not proceed until consultations had been held with Armour engineers and in many instances the necessary approval was delayed by plaintiff's personnel.

The lines of responsibility between the contractor and the owner became blurred. After some time on the job, the defendants seemed to take the attitude that this had become a time and material, instead of a fixed price contract, although certainly the plaintiff had not acquiesced in such a concept.

While extra work orders were issued to compensate for the expense in making such changes as enlarging one room of the building, changing the make-up and size of doors, extra amounts of wiring, extra amounts of refrigeration and equipment, etc., no allowance was being made for the delay and the disruption in scheduling caused by the indecision of Armour on many technical points.[4]

It soon became clear that the defendants' original rough plan of procedure was no longer feasible.

During the spring of 1968 when some of the Armour engineering personnel had begun to have doubts about the completion date scheduled for later that year and began to keep records on the amount of time spent on the job by Nard, the executive branch of the meat company asked the defendant to do some preliminary work on another plant in Sioux City, Iowa. Nard began preliminary visits in April and by September of 1968 when matters had reached almost crisis proportions on the Pittsburgh job, he signed another contract to build another plant in Sioux City for the plaintiff.

While the Armour performance was marked by delay, indecision and lack of appreciation of the problems involved, Nard, really the only man from the defendant partnership who was active in the project, was proving equally adept in turning the sinews of the project into sausage.

Although this was a complicated plant and the design and build concept, particularly, required close synchronization between the various crafts and phases of the operation, Nard did not hire a coordinator to insure that the mechanical hand knew what the electrical hand was doing and when. While not an engineer, he

4. *See* Johnson v. Fenestra, Inc., 305 F.2d 179 (3rd Cir. 1962).

considered himself equal to the task of guiding the professionals in this field and had no full-time superintendent on the job.

Nard had no formal accounting procedures either at the job site or at the Three Rivers office in downtown Pittsburgh specifically to deal with this construction project. Such accounting as there was, was furnished by regular employees of the partnership who continued to carry on their regular duties of mortgage payment and rental accounting, etc. while the construction work was proceeding.

Nard was not a believer in such organizational favorites as progress and manning charts or critical path graphs. He did not cooperate with the Armour engineers when they sought to plan the project ahead on such bases and instead chose to rely on his personal supervision without any written schedule. That this would cause conflicts when he was working with a large corporate organization with its customary book of rules and typical bureaucratic regulations seems obvious.

The lure of another large project proved irresistible to Nard and led to a situation not uncommon among contractors of undertaking more work than can be handled. This is apt to be dangerous for most small operators and usually disastrous to a man who relies on his personal efforts rather than on a skilled organization. And so it was in the summer of 1968 and the month of September when all of his efforts were needed in Pittsburgh to cope with the rapidly worsening situation that Nard undertook to build another plant for Armour in Sioux City, spreading himself thin at a most inopportune time.

Nard's seemingly self-induced impression that the Pittsburgh job had become almost a time and materials agreement came to the fore in September of 1968 when it became known that all of the subcontractors were not being paid and that many of their accounts were delinquent. This warning flag caused Armour to agree to consider Nard's request for a release of some of the retainage. However, for reasons best known to the plaintiff's financial hierarchy, it was decided instead to make loans to Three Rivers to be applied against future progress payments.

The money thus made available, unfortunately, did not equal the amount claimed to be due by the various trades and materialmen and Nard admitted during the trial that he took no responsibility for paying the subcontractors after September. In the realities of the construction industry it is difficult to conceive a more telling admission of lack of responsibility on the part of a general contractor.

While the work was continuing, it became obvious to plaintiff's personnel by October that the plant would not be completed that month as had originally been planned and that they were facing an overrun of one million dollars or more. The Armour executives decided that if the general contractor would not agree to assume the obvious additional costs for completion (certainly a wishful thought), the next best thing was to keep him on the job as long as the contract funds remained available and then terminate the agreement.

The situation at the job site in the latter part of November was highlighted when the subcontractor installing some of the overhead rails for a conveyor system in the processing plant packed up his hand tools and prepared to leave the job site because he had not been paid. Such activity is apt to be highly contagious and it was obvious that the unhealthy condition of the project had to be rectified.

Armour terminated Nard's contract by letter of November 21, at a time incidentally when he was in Sioux City working on their plant there. Efforts by the plaintiff then began in earnest on such matters as securing agreements

with the subcontractors to complete their work on the project, taking over the job from Three Rivers, making payments under the surety bond, and preparing for the inevitable race to the courthouse. In the latter category Armour was a clear winner, their suit being filed on November 26, 1968 only five days after the contract was terminated.

As if all of this had not been bad enough, Nard had added what Armour considered to be an excessive amount of seasoning to the process by constructing a lavish house for himself, in part with funds which Armour had thought were being used for its meat plant.

It seems that Nard broke ground in the late winter of 1967 for his home, having engaged a general contractor who had no connection with the meat plant job but who utilized many subcontractors who were performing work on the Armour project.

The invoices of many of the subcontractors were directed to the Three Rivers Company, admittedly at the instructions of Nard. While he claimed that all had been cautioned to keep separate accounts for the house and the plant, in some instances it is clear that the subcontractors commingled the charges for labor and materials for the two projects at Nard's suggestion. The invoices as rendered to Three Rivers referred only to the Armour project and were kept in that file by the partnership employees.

The largest billings were submitted by the McCully-Smith Company, the mechanical subcontractor on the Armour plant. These invoices were sent to Three Rivers without any designation as to which job was involved and without any detail. However, testimony established that among the "E.W.A.'s" listed by number which covered extra work on the Armour plant was one designated "E.W.A.40", through which the general contractor and various materialmen on the house received payment. Also included in "E.W.A.40" were bills for al-

terations to the residence of Stewart Scott, another of the named defendants.

While the invoices which formed the basis for the "E.W.A.40" charges were scrupulously filed by McCully-Smith at its office, they never accompanied the billings sent to Three Rivers. All that was revealed in the invoices sent by McCully-Smith were the names of the suppliers, amounts paid and hours of labor performed, with no indication of where the construction was located.

An accountant for the plaintiff testified at the trial that it was not possible to tell from the books of Three Rivers how much had actually been spent on the Nard and Scott homes and the amount which had been charged, inadvertently or not, to Armour. However, he did say that of the total of $256,448.07 billed by McCully-Smith and designated "E.W.A. 40" invoices, a minimum of $205,900.00 had been paid by Three Rivers.

A representative of the Lendoll Company, the masonry subcontractor which handled both the house and plant work, testified that he had put all of his charges on the plant bill as Nard had indicated and that approximately 36,000.-00 for brick work on the residence had been paid by Armour.

Nard claimed that the progress payment requests which he submitted to Armour periodically were computations prepared by the plaintiff's engineer and accountant at the job site, based on their estimates of the percentage of work completed, rather than on invoices submitted by the subcontractors for their work to that date. This was not seriously controverted by Armour.

It is argued, further, that since Nard had a fixed price contract with the plaintiff, Armour would not be financially affected even if Nard had later caused the subcontractors to inflate their bills for work on the meat plant. If the Armour project had worked out according to plans and the building had been completed within the budget allowed, all might have been well, assum-

ing that Nard's partners had no objection to this arrangement as indeed he so testified. Nard said that his partners knew that he was building his home out of the expected gain on this job, that this was to be his share of the project and in effect his procedures amounted to nothing more than anticipating his profit.

Armour complains with some justification that the defendants did not comply with the spirit of the certifications which were filed as a prerequisite to progress payments—and in some instances with the letter as well. But again, Armour accounting was lax also, particularly in the light of its knowledge of Nard's inadequate controls and unorthodox methods. Furthermore, the letters of certification showed clearly that all of the progress payments were not going to subcontractors but that substantial amounts were being credited to Three Rivers' account and this despite the unusually large 15 percent retainage.

■ All in all, as the testimony unfolded during the two and a half week trial, it became obvious that this was a classic case of breach of contract by both parties and that it would be impossible for any judge or court to evaluate with any degree of accuracy the degree to which the increase in the ultimate cost of the building was attributable to each of the offending parties.

Certain it is that Nard has no claim for any profits because his own breaches of the contract did much to bring about the unhappy result. On the other hand, although Armour did its part in producing the debacle and eventually paid more for the plant than originally anticipated,

it does have a substantial functioning structure which generally appears to have been fairly well constructed and designed and which is operating at an efficiency rate far above the older structure which it was to replace.

■■ The situation then would seem to fall within the general rule that neither party is entitled to damages where both breach the contract or, as expressed in some situations, neither is entitled to recover in the absence of measurable benefit to one of the parties.[5]

## II.

■ However, this does not end the matter because there is some accounting due between the parties, not because damages are payable but because there are some items of restitution which must be considered.

According to the exhibit prepared by plaintiff's accountant who examined Three Rivers records,[6] that organization was paid $395,101.00 by Armour in addition to the amounts which the partnership disbursed to the subcontractors who worked on the job.[7] This should be awarded to Armour. Indeed during the trial, defendant conceded that plaintiff was entitled to a "credit" for funds in this category. To fail to require restitution of this money would be in effect to award a profit to the defendants.

A second category involves the monies paid on "E.W.A.40" invoices which were used to finance the residences and represent funds transmitted to the defendants by Armour which it had a right to assume were being used for the payment of bills incurred in the construction of the meat plant.

5. *See* Automotive Devices Co. v. Automotive Devices Co. of Pa., 292 F.2d 663 (3rd Cir. 1961); General Metals Inc. v. Green Fuel Economizer, 213 F.Supp. 641 (D.C.Md.1963); 8 Pa.Law Encyclopedia, Contracts § 305 (1958). We do not consider this case as coming within the provisions of Res.Contracts § 357.

6. Plaintiff's Exhibit 42.

7. Payments to Three Rivers by Armour (exclusive of $300,000.00 which represents settlement of earlier claims) $5,273,350.00 less payments made by Three Rivers to subcontractors $4,878,249.00.

The letters of certification accompanying the defendant's progress payment requests represented that the checks issued to subcontractors and suppliers contemporaneously with the certifications were for "work and/or materials supplied the Armour job". Obviously that statement was inaccurate when some of the checks included sums for work on the Nard and Scott residences, and it is true that Armour was misled into believing that the subcontractors' accounts were current. Whether this practice was fraudulent as the plaintiff contends or merely an ill-advised anticipation of profit, or as the defendant contends, mere negligence, is not determinative.

There was a diversion of funds received from the plaintiff which should be rectified, despite the fact that Armour is not entitled to damages as such for breach of the contract.

The accountant who testified for the plaintiff expressed his opinion that $205,900.00 had been paid to McCully-Smith Inc. on "E.W.A.40" invoices by Three Rivers. We accept that opinion and conclude that that sum should be awarded to the plaintiff.

In addition, since the Lendoll Company was paid in error by Armour for some $36,000.00 of brick work on the Nard residence through a Three Rivers billing on the Armour plant, that money should also be restored.

Furthermore, evidence at the trial established that $33,213.00 was paid to Penn Plumbing Company by Armour for work actually performed at the Nard house. This, too, should be reimbursed.

The plaintiff also claimed various other sums said to be for work on the Nard residence for which Armour had paid. The proof for some of these claims was inadequate and in some instances Armour had properly utilized self help in recouping from the subcontractors involved so that no further amounts are owing.

To summarize, Armour is entitled to restitution of the following items:

| | | |
|---|---|---|
| 1. | $395,101.00 | the amount received by Three Rivers in excess of payments to subcontractors. |
| 2. | 205,900.00 | payments made on "E.W.A.40". |
| 3. | 36,000.00 | Lendoll Corp.—brick work. |
| 4. | 33,213.00 | Penn Plumbing work. |
| | $670,214.00 | |

Interest on this sum should be computed at the legal rate of 6% from November 21, 1968, the date of the termination of the contract, amounting to $139,069.00. The total amount of restitution therefore is $809,283.00.

### III.

Since a substantial portion of the money awarded to Armour has in fact been used to construct the home presently owned by John and Kathleen O. Nard, the plaintiff has urged that a constructive trust be imposed upon the home. The Court of Appeals, in permitting the joinder of Kathleen Nard as an added defendant, stated that ". . . the constructive trust requested would do more than render the residence property available, if appropriate, to satisfy any judgment plaintiff might obtain based on fraudulent diversion." Even if no fraud be found, as we had indicated earlier, there has been a diversion and we consider ourselves bound by the opinion of Judge Seitz as being the "law of the case." [8]

The testimony indicated that approximately $29,000.00 of the E.W.A. 40 payments were for the Scott residence. We subtract those therefore since this should not be a charge on the Nard house. This means that the constructive

---

8. Restatement of Restitution § 206, comment (b) holds that a constructive trust would not be imposed in a situation like this but that an equitable lien would be ordered. This may be a distinction without a practical difference and in any event we find no Pennsylvania cases adopting this view.

trust on the Nard residence would amount to:

| | | |
|---|---|---|
| $176,900.00 | E.W.A.40 payments less $29,000.00 | |
| 36,000.00 | brick work | |
| 33,213.00 | plumbing work | |
| $246,113.00 | | |

## IV.

██ Armour, as surety, was required to pay $1,905,000.00 in claims of subcontractors after termination of the Three Rivers contract. Plaintiff claims a right of reimbursement as surety, apart from its right to recover damages. In essence, the plaintiff asserts that as surety it occupies a separate and distinct status, insulating it from defenses which might be utilized against it in its capacity as owner.

We perceive no reason, in law or equity, however which would justify such a position. We have not been able to discover any case law applicable which is not particularly surprising since it is indeed a rare occurrence when an owner will act as surety for a contractor. Cases dealing with the usual situation where the surety is a third person or a commercial bonding company are not pertinent to the factual conditions here.

Armour advances as a basis for recoupment, among other theories, the right of subrogation. But this is essentially an equitable right, governed by the practicalities of the situation between the parties rather than inappropriate technical labels.[9] The payments made by Armour were for work performed upon its plant. It has received the benefit of that work albeit at a premium price. To allow recovery by the plaintiff of this claim would in effect be to prorate the expense of completion of the contract in excess of the original price, a procedure to which we do not believe the plaintiff is entitled. Indeed the ultimate effect would be to allow the bulk of loss to be thrown upon the defendants, although the facts otherwise would not lead to such a result.

In summary, we hold that since Armour as owner is not entitled to recover damages, it is likewise barred as surety since there are not two separate entities involved but only one. To find otherwise would be to create an artificial and technical distinction completely out of touch with reality.

## V.

██ Armour also submitted a separate claim for reroofing the plant. An inspection of the plant was made by the court and it was obvious during that time that there were a number of leaks through the roof which substantially hampered production. The plaintiff's expert contended that the leaks in the roof were caused by the absence of a vapor barrier which he says should have been included in the structure. However, Armour was aware of the problems of vapor and moisture under the roof as their memorandum of May 24, 1966 [10] reveals, and they did not include such a vapor barrier in the specifications for the roof which were included in the contract documents of August, 1967. Since the building project developed into so much of a joint effort, we feel that, again, Armour is in no position to complain of the design of the roof construction when it had more knowledge of the conditions under which the plant would operate than the contractor but failed to insist upon a vapor barrier.

It is also significant that substantial changes have been made to the roof and a number of openings made in it for various items of equipment since the time that the defendants left the job.

This claim, therefore, falls in the same category as the rest of the construction, that is, both parties having

---

9. *See* the excellent discussion of the doctrine by Chief Judge Brown in Compania Anonima Venezolana De Navega-

cion v. A. J. Perez Export Co., 303 F.2d 692, 697 (5th Cir. 1962).

10. Nard Exhibit 7.

been guilty of breaches of the contract are not in a position to claim damages from the other.

An appropriate order will be entered.