601 F.2d 155
 26 Cont.Cas.Fed. (CCH) 83,526
 WESTINGHOUSE ELECTRIC CORPORATION, Aerospace and Electronic
Systems Division, Defense and Electronic Systems
Center, Appellant,
v.
The GARRETT CORPORATION, Airesearch Manufacturing Company, a
Division of the Garrett Corporation, Appellee.
WESTINGHOUSE ELECTRIC CORPORATION, Aerospace and Electronic
Systems Division, Defense and Electronic Systems
Center, Appellee,
v.
The GARRETT CORPORATION, Airesearch Manufacturing Company, a
Division of the Garrett Corporation, Appellant.
 Nos. 77-2403, 77-2404.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1978.
Decided July 12, 1979.
 
 John Vanderstar, Washington, D. C. (John Bolton, Covington & Burling, Washington, D. C., Maurice J. Gilchrist, Bronxville, N. Y., Westinghouse Elec. Corp., on brief) for appellant in No. 77-2404 and for appellee in No. 77-2404.
 Edmund P. Dandridge, Jr., and George C. Doub, Jr., Baltimore, Md. (John Henry Lewin, Venable, Baetjer & Howard, Baltimore, Md., on brief) for appellee in No. 77-2403 and for appellant in No. 77-2404.
 Before WINTER, RUSSELL and WIDENER, Circuit Judges.
 PER CURIAM:
 
 
 1
 Westinghouse Electric Corporation (Westinghouse) brought this action against The Garrett Corporation (Garrett) for breach of contract. Garrett denied that it had breached the contract, and filed a counterclaim alleging that Westinghouse had wrongfully terminated the contract. Jurisdiction is based on diversity of citizenship. After a non-jury trial on the merits, the district court found that both parties were equally responsible for the delays which led to Westinghouse's decision to terminate the contract, and that therefore neither party should be allowed to recover for the other's breach. Westinghouse Electric Corp. v. Garrett Corp., 437 F.Supp. 1301 (D.Md.1977). We affirm.
 
 
 2
 The entire factual setting of this case is rather detailed. The controversy, however, centers around facts which can be stated fairly simply. Westinghouse contracted with the United States Air Force to supply Electronic Counter Measure (ECM) pods.[1] Westinghouse subsequently contracted with Garrett for the supply of cooling systems for the ECMs. The parties agreed that time was of the essence in this contract. The subcontract also contained the termination for default and termination for convenience clauses used in standard government contracts.[2] For various reasons, some of which are more fully discussed below, Garrett fell behind in design and production of the cooling systems, and on July 29, 1971, after much correspondence and numerous meetings between the parties, Westinghouse requested, pursuant to the contract, that Garrett show cause why the contract should not be terminated for default. Garrett answered by alleging that the delays were caused by Westinghouse. Westinghouse then terminated the contract. This suit for damages followed.
 
 
 3
 The central question in this case is who was responsible for the delays. If Garrett was responsible, then it defaulted on the contract and gave Westinghouse the right to terminate the contract for default. If Westinghouse was responsible, then its default termination was erroneous and will be transformed to a termination for convenience, and Garrett will have the right to recover its costs.
 
 
 4
 The delay attributed to Westinghouse lies mainly in its failure to supply final source control drawings (SCD) to Garrett on time. The parties agree that the contract required Westinghouse to furnish these drawings, but Westinghouse argues that it supplied all the information required, albeit in a different form than that described in the contract, and that it therefore fulfilled the substance if not the letter of its obligation. The district court examined this argument in great detail and concluded that Westinghouse had not met its obligation in any alternative form and that even when the SCD's were belatedly furnished they contained numerous errors which caused further delays. It further found that the failure to perform by Westinghouse did not amount to a mere change so as to be cognizable under the changes clause of the contract which would have required Garrett to continue to perform despite changes. 437 F.Supp. at 1331 et seq. We have reviewed the district court's findings of fact on this question and find that they are not clearly erroneous. Neither are its legal conclusions in error. Westinghouse's breach of contract substantially contributed to Garrett's delay. It is therefore clear that Westinghouse's default termination was improper. The burden was on Westinghouse to show that Garrett was responsible for the default, and the district court properly held that this burden had not been met because Westinghouse's own misconduct had caused a substantial portion of the delay.
 
 
 5
 At this point, Garrett argues that since Westinghouse's termination for default was improper the termination is automatically transformed to a termination for convenience. The district court disagreed, pointing to the language of the termination clause which allows the seller to escape the default termination provisions only if he is in fact not in default or if default is not due to his fault or negligence or beyond his control. 437 F.Supp. at 1339. It found that Garrett's default, because it had contributed to the delay, should be considered and not excluded from consideration. The main delay caused by Garrett was its failure to pursue United Aircraft Products' (UAP) design for the aerodynamic surface heat exchanger (ASHX). UAP was also a subcontractor on the ECM project. Garrett felt that the ASHX design proposed by UAP would not provide sufficient cooling to meet Garrett's requirements. The district court found that at a meeting between Westinghouse and Garrett, Westinghouse gave Garrett permission to pursue an alternative design, but that no permission was given to abandon UAP's design. Garrett did abandon UAP's design which resulted in a four week delay. Garrett argues that this delay was of no consequence because the delay caused by Westinghouse's failure to provide final SCD's was in progress during the same period of time. This argument is without merit. If we were to accept Garrett's position, then Westinghouse could just as reasonably argue that the delay in its failure to provide SCD's should not count against it. We have reviewed the record and hold that the district court's finding that Garrett contributed to the delay was not clearly erroneous.
 
 
 6
 Having found that both Westinghouse and Garrett were responsible for the delay, the district court refused to change Westinghouse's improper default termination into a termination for convenience. Garrett describes this result as a balancing of fault which improperly applies tort principles in a contract setting. We do not agree. First, the terms of the contract, as the district court points out, appear to accommodate such a result. Under an identical termination provision, the Court of Claims was willing to balance the fault of the parties and make an equitable adjustment in awarding damages. Dynalectron Corp. v. United States, 518 F.2d 594, 207 Ct.Cl. 349 (1975). Second, under both Maryland law and general contract law, courts have held that in some instances where both parties are at fault (or in default) neither may recover. General Metals, Inc. v. Green Fuel Economizer Co., 213 F.Supp. 641 (D.Md.1963); Automotive Devices Co. v. Automotive Devices Co. of Pennsylvania, 292 F.2d 663 (3d Cir. 1961); Armour and Co. v. Scott, 360 F.Supp. 319 (W.D.Pa.1972); see 6 Williston, Contracts § 882 (3d ed. 1962). Whether this doctrine is described as failure of consideration, failure to satisfy a condition precedent, or mutual breach of contract, it is clear that in proper circumstances a court may refuse to allow recovery by either party to an agreement because of their mutual fault, which in contract terms might be more properly described as mutual default. We think this is such a case.
 
 
 7
 We are therefore of opinion that the district court, in balancing the great mass of evidence before it, reached a legally permissible result. Further, its fact findings were not clearly erroneous.
 
 
 8
 Accordingly, we affirm for the reasons stated in the opinion of the district court.
 
 
 9
 AFFIRMED.
 
 
 
 [1]
 ECM pods are attached to aircraft and used to jam enemy radar
 
 
 [2]
 The contract incorporates Armed Services Procurement Regulation § 8.707 with certain modifications. The text with modifications is set out in footnote 47 of the district court's opinion and in part reads as follows:
 "(a) The Government may, subject to the provisions of paragraph (c) below, by written notice of default to the Contractor, terminate the whole or any part of this contract in any one of the following circumstances:
 "(i) If the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
 "(ii) If the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days . . . after receipt of notice from the Contracting Officer specifying such failure.
 "(c) Except with respect to defaults of subcontractors, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes may include, but are not restricted to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of the Contractor. . . .
 "(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause. If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, and if this contract does not contain a clause providing for termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly; failure to agree to any such adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes'.
 "(f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
 "In subparagraphs (a), (b), (d), (e), and (f) 'the term Contractor (is) deemed to mean Seller; Government and Contracting Officer (are) deemed to mean Buyer.' In subparagraph (c) 'the term Contractor (is) deemed to mean Seller, the term Government . . . mean(s) the Government of the United States.' "
 
 
 [437]
 F.Supp. at 1334-35, n. 47