**CLAY BERNARD SYSTEMS INTERNATIONAL, LTD., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 181–89C.**

United States Claims Court.

April 9, 1991.

---

Frank M. Rapoport, Philadelphia, Pa., attorney of record for plaintiff. Julie L. Witcher, David B. Stinson, Saul, Ewing, Remick & Saul, of counsel.

Robert E. Kirschman, Jr., Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for defendant. Donald Tracy, Defense Logistics Agency, of counsel.

## OPINION

HARKINS, Senior Judge.

In this contract case, Clay Bernard Systems International, Ltd. (CBSI) challenges a decision of the Armed Services Board of Contract Appeals (ASBCA), *Clay Bernard Systems International, Ltd.*, 88–3 B.C.A. ¶ 20,856, 1988 WL 61574 (ASBCA 1988). Standards of the Wunderlich Act apply to this review of the ASBCA decision. 41 U.S.C. §§ 321–22 (1988).

The contract called for the design, development, delivery and installation of a mechanized materials handling system, referred

to as the Depot Integrated Storage and Retrieval System (DISARS), in two warehouses (numbers 59 and 66), at the Defense General Supply Center (DGSC) in Richmond, Virginia, a facility of the Defense Logistics Agency (DLA). The contract was awarded to CBSI on July 10, 1978, on a fixed price basis; it contained the standard articles for Site Investigation, Default, Termination for Convenience, Disputes and Changes. In addition to the installation of DISARS, the contract included reconfiguration of existing storage and warehouse facilities in the two warehouses, and rewarehousing of inventory from existing storage facilities to the new DISARS configuration. All of the contract work was to be completed by July 10, 1980, with CBSI to provide maintenance and site support for a period of one year after acceptance of the system.

Installation of DISARS at DGSC was a component of a continuing program in the DLA. The contract, accordingly, involved coordinated action with DLA headquarters located in Ogden, Utah, the Defense Construction Supply Center (DCSC) in Columbus, Ohio, the Defense Systems Automation Center (DSAC) in Ogden, Utah, the Defense Electronics Supply Center (DESC) in Dayton, Ohio, as well as with DGSC, in Richmond, Virginia. DLA's organization for dealing with its automation program and this contract was cumbersome; it contributed to contract deficiencies and impeded efficient contract administration. CBSI's work on DISARS, for the most part, was done at its facilities in Tulsa, Oklahoma.

In its decision, the ASBCA made 159 detailed findings of fact that examine virtually every step in the relationship of the parties during the contract period. CBSI challenges only three of the board's findings of fact under Wunderlich Act standards. Substantial evidence in the record supports the findings of fact made by the ASBCA, and they are binding on the court. A recital of the board's findings of fact is unnecessary, and factual information is repeated here only to the extent needed to provide perspective for the decision.

The contract was the product of a two-step Invitation for Bid (IFB) solicitation by the DGSC in Columbus, Ohio. In Step I, 44 firms were solicited, but only two technical proposals were received. Both of the technical proposals were found acceptable, and the companies were eligible to participate in the IFB for Step II. Prior to bid opening, one applicant withdrew from bidding, which action resulted in conversion of the IFB to a Request for Proposals (RFP). CBSI submitted the only response to the RFP. DCSC solicited and issued the contract. DGSC was to administer the contract.

In form, the contract was an assemblage of materials incorporated by reference. The contract schedule identified the complete DISARS as 1 ea. (Lot), under contract line item number (CLIN) 0001. Only the subitems (CLINs 0001AA through 0001BM), however, were priced. The board computed the price for the entire effort in CLIN 0001 at $8,087,874. The descriptions of the subitems were abbreviated and ambiguous. Their content could only be ascertained by reference to the Government's price negotiation memorandum and CBSI's cost proposal. The contract price for storage bay reconfiguration was computed at $502,879, and for rewarehousing at $36,049.

The board interpreted the contract, with respect to the installation of DISARS in the Richmond warehouses, to involve three categories of work: (1) provision of computer hardware, (2) provision of computer software, and (3) provision of an interface with a system known as Mechanization of Warehousing and Shipping Procedures (MOWASP). The computer hardware and computer software that made up the DISARS was to have the capability to function independently as an automated warehousing system.

Computer hardware to be provided by the contract essentially consisted of modified forklift vehicles called IMPS (Intelligent Mobile Production Stations), which were equipped to transfer storage modules to or from storage locations, and related physical control items. Each IMP had a

computer consisting of a cathode ray tube (CRT), keyboard, printer, and a microprocessor. IMPS were to be controlled by electrical impulses received from the DISARS central computer by way of electrical wires embedded in the floor. Twenty IMPS were to be furnished, plus a modified version referred to as the "intelligent tractor." The hardware also included a computer system consisting of a central processing unit (CPU), sometimes referred to as the Depot Integrated Storage Controller (DISC), remote terminals (DRT), with keyboards and display screens.

The computer software to be provided by the contract consisted of programs designed to generate and record pertinent information, and to direct appropriate storage operations in DISARS. The interface with MOWASP generated most of the trouble in contract performance, and is the focus of CBSI's appeal from the ASBCA's decision.

The purpose of the MOWASP system is stock control and processing of receipts, stowages and issues for DLA. Computer programs for MOWASP are maintained by the DSAC in Ogden. Although the MOWASP system operates throughout DLA, the computers on which it is installed are located at individual depots. Remote terminals for MOWASP are located in warehouse buildings to allow transactions to be processed within the system. Two types of interface are possible: off-line and on-line. Off-line transactions are processed by the computers in a batch mode through computer cards or tapes. In an on-line interface, the two computers communicate in "real time" over a wire.

The contract specification for DISARS, and for the MOWASP interfacing, are concerned with end performance, and do not set forth clearly or with specificity what software was required for DISARS installation. The specification provides that the contractor will provide sufficient design and operating criteria to assure DGSC that the DISARS central process controller will control all elements of the DISARS system as well as interfacing with existing and future DGSC computer systems. The spec-

ification also required the DISARS DISC as supplied by the contractor to interface all systems and documents of the present DLA computer systems and the DISARS to function as a remote without the other DLA computer systems being modified to accommodate DISARS. CBSI's technical proposals stated that DISARS would provide an on-line interface to MOWASP.

Deficiencies in the contract and technical specifications created problems and controversy throughout the period of performance. The contract schedule provided for delivery or completion of the various CLINs in terms of months after the effective date of the contract: "Scheduled Delivery/Completion Months ARO." The schedule was clarified by the parties in P00003 (Mod 3) by designation of specific dates for time of delivery FOB destination. CLIN 0001AC, Software Engineering, provided the entire 1 Lot would be delivered by July 10, 1980, the start up date for the complete system. The contract schedule did not establish phased delivery dates for the numerous subsidiary software programs involved.

The technical personnel of the parties spent hours in controversy to define the DISARS data base and design criteria. These problems were complicated by the dominant role taken by DSAC and DLA Headquarters. DGSC was required to coordinate all aspects of DISARS software requirements with DSAC prior to approval of CBSI's proposals. The Government position on the functions, operations and formats required for DISARS to interface with MOWASP was developed after the contract had been awarded in a series of documents, called "Fact Sheets" prepared by DSAC and DGSC. CBSI took the position that the software interface defined by the Fact Sheets expanded the contract specifications. When the technical personnel were unable to resolve differences as to the Fact Sheet requirements, DLA Headquarters directed that DGSC should not negotiate the elements of the interface with CBSI until DLA had reviewed and approved a "baseline" interface document that specified all interface transactions and data requirements. Definition of these ele-

ments of the software specifications was not completed by DGSC until mid-December 1979, and the baseline interface document was not approved by DLA Headquarters until March 11, 1980.

By July 1979, concern that Fact Sheet disputes and interface data problems could interfere with the July 10, 1980, DISARS delivery date, generated the first of a series of "summit meetings" between DGSC's commander and CBSI's top management. At the July 11–12, 1979, meeting, CBSI first suggested the parties concentrate on DISARS, and consider enhancements, such as the MOWASP interface, at a later date.

During meetings in November 1979, the DGSC commander learned that DSAC considered DGSC's concept in the interface baseline document to be unsound. The commander realized that an interface with DISARS using MOWASP format could not be delivered by July 10, 1980. On November 26, 1979, DLA was told by the DGSC commander, in a briefing at DLA Headquarters, that it appeared certain that an on-line interface would not be operational by July 10, 1980, and that DGSC had no alternative other than to accept a DISARS that would be functionally operational at DGSC, but without an on-line interface with MOWASP.

During January and February 1980, the technical personnel of DGSC and CBSI concentrated on an operational DISARS for DGSC. Senior personnel, of both parties, thereafter worked together to deliver a system which would be operational without an on-line interface. Those officials understood that such a system was to be available by July 10, 1980. The Contracting Officer (CO), through discussions with CBSI's contract administration personnel, and its project manager, knew by January 13, 1980, that CBSI intended to have a DISARS in operation by July 10, 1980, but that it would not include an on-line interface with MOWASP.

DLA Headquarters by its approval on March 11, 1980, of the baseline interface document, required DISARS to interface with MOWASP using MOWASP existing conversational mode without modification.

THE ASBCA found that the DGSC commander, on receiving the March 11 approval from DLA Headquarters, knew that CBSI could not comply with the July 10, 1980, delivery date, and that only one option remained: to terminate the contract.

The CO executed and forwarded Modification P00006 (Mod 6) on March 11, 1980. Mod 6 was a unilateral change order that incorporated revisions to the DISARS specifications based on the Fact Sheets and discussions since June 1979, and provisions that gave effect to the MOWASP baseline interface document approved by DLA Headquarters. Mod 6 made no changes in the delivery schedule, and provided that any adjustment in price or delivery schedule would be made at a later date.

The parties positions with respect to the content and effect of Mod 6 were defined in letters from CBSI dated April 11, 1980, and the response from the CO dated April 24, 1980. The ASBCA concluded that this correspondence constituted an amendment to Mod 6 so that CBSI was not contractually obligated to deliver by July 10, 1980, a DISARS system meeting all of the contract specifications (including some of the modification's changes) particularly with respect to the MOWASP interface.

On July 10, 1980, CBSI did not have in place at DGSC an operational DISARS. With respect to DISARS hardware, only 11 IMPS had been delivered, and none were operational on July 10, 1980. In addition to the failure of the IMPS, the floor wiring and guidance system had been installed carelessly, with the result that dirt and trash accumulated in the grooves and wires were severed. Communications were never established between the IMPS and the DISARS central processing unit through the floor wire system.

On July 11, 1980, the CO sent to CBSI a 10–day cure notice as authorized by General Provision No. 11, Default, paragraph (a)(ii). The notice stated that since CBSI had failed to perform the contract within the time required, the Government was considering terminating the contract. CBSI's July 24, 1980, response contended that termination for default would be im-

proper because, among other contentions, Mod 6 impacted all contract line items having to do with system functions, with the result that all delivery dates were removed until the results of Mod 6 as to price and delivery were negotiated into the contract. On August 1, 1980, the CO by TWX terminated the contract for default, effective immediately, for failure to deliver a mechanized material handling system for DGSC in accordance with the established delivery schedule.

The termination for default action by the CO went to the entire contract: computer hardware, software for DISARS at DGSC, and software that would interface DISARS with MOWASP. The ASBCA, in its May 2, 1988, decision, decided that the default termination as to outstanding computer hardware was appropriate. The board upheld the default determination as to DISARS software on the ground that it could not conclude that the failure to develop the DISARS–capable software was due to causes beyond CBSI's control or without its fault. The board overruled the CO's default decision as to failure of a timely delivery on the MOWASP interface. The board concluded that CBSI was entitled to recover those costs associated with its attempts to comply with the MOWASP interface aspects of the DISARS system software.

## DISPOSITION

■ The scope of review by this court of the ASBCA decision is defined by statute. The board's findings on disputed facts are conclusive and binding on the court, unless the finding of fact is fraudulent, or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. 41 U.S.C. § 321 (1988). Finality of board findings of fact, and the limits of judicial review, have been defined in a series of decisions by the Supreme Court. Judicial review of a board's fact finding is confined to the record presented to the board. Factual issues resolved by the board in a case within its jurisdiction are binding on a court in a subsequent action for breach of contract or in any collateral proceedings when the same facts are in issue. *United States v.*

*Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

■ The standard of review in a Wunderlich Act case goes to the reasonableness of agency action on the basis of the record before it. The Court of Claims, guided by an analysis of classic opinions of the Supreme Court and of its own precedents, defined the content of the substantial evidence rule in *Koppers Co. v. United States*, 405 F.2d 554, 186 Ct.Cl. 142 (1968). Substantial evidence is evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence is directed. If there is substantial evidence to support either of two contrary findings of fact, the one adopted by the board is binding on the court, whatever its own evaluation of the evidence might be. Whether specifications are factually impossible or commercially impracticable to perform is a question of fact, not of law. The ultimate issue, however, as to whether the default is excusable, is one of law. If the board has failed to make a relevant finding of fact and the relevant evidence is undisputed, the court may make a supplementary finding without returning the case to the board. Analogously, where the evidence is disputed but the overwhelming weight of evidence strongly points to one conclusion of fact, the court, to avoid an "empty ritual," may make a necessary contrary finding without returning the case to the board. *Koppers Co. v. United States*, 405 F.2d at 557–59.

■ Under the Wunderlich Act, administrative determinations on questions of law are not final and legal conclusions may receive plenary review. 41 U.S.C. § 322 (1988). The interpretation of a contract is a question of law, and an administrative interpretation of a contract is not binding on the court. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir.1985). Where a board finding entails

the application of a legal standard to a given factual pattern, the finding may involve a mixed question of fact and law. As to such a finding, the underlying facts are reviewed under the substantial evidence standard, but review of the conclusion is plenary. *Foster Wheeler Corp. v. United States*, 513 F.2d 588, 593–94, 206 Ct.Cl. 533 (1975). Board decisions on questions of law, and its interpretations of contract provisions, are entitled to careful consideration and are accorded great respect. *George Hyman Constr. Co. v. United States*, 564 F.2d 939, 944, 215 Ct.Cl. 70 (1977). Decisions of law made by the board will be credited when they are reasonable and are based on the board's expertise. *Dale Ingram, Inc. v. United States*, 475 F.2d 1177, 1185, 201 Ct.Cl. 56 (1973); *H.N. Bailey & Associates v. United States*, 449 F.2d 376, 387, 196 Ct.Cl. 166 (1971).

CBSI contests the board's findings of fact Nos. 85, 86, and 94, which relate to CBSI's decision to use its own software design concepts, rather than follow the Fact Sheets, as not representing an accurate representation of CBSI's position regarding the Fact Sheets, or the actual nature of the dispute between the parties. CBSI's arguments essentially are an attempt to have the court reweigh the evidence. This is not appropriate under Wunderlich Act standards. Findings of fact Nos. 85, 86, and 94 reflect the status of the parties' relationships at the relevant times, and the findings intertwine the parties' contentions as to the DISARS specifications with contentions as to the criteria for the MOWASP interface. These findings of fact have the support of substantial evidence.

■ The board's decision to uphold the default termination as to two of the contract areas is not subject to challenge on the basis that its facts are erroneous. The core issue is whether the board's analysis of the scope and effect of the amendment to Mod 6, as reflected in the April 11 and April 24, 1980, correspondence, is correct as a matter of law.

The CO's written notice of default on August 1, 1980, was made pursuant to General Provision No. 11, Default, Standard Form 32 (Supply Contract), NOV 1969 Ed. The default clause in paragraph (a) authorizes the Government to terminate the whole or any part of the contract: (1) if the contractor "fails to make delivery of the supplies or to perform the services within the time specified"; or, (2) if the contractor "fails to perform any of the other provisions" of the contract, or "so fails to make progress as to endanger performance", and in either of these two circumstances does not cure such failure within a period of 10 days after receipt of notice from the CO specifying such failure.

If the Government terminates a contract as provided in paragraph (a), the contractor may be liable for excess costs under a reprocurement, as authorized in paragraph (b). Paragraph (c), however, provides the contractor is not liable for any excess costs if the failure to perform "arises out of causes beyond the control and without the fault or negligence" of the contractor.

In this case, the CO gave a 10–day cure notice on July 11, 1980, for the stated purpose to determine whether CBSI's "failure to perform arose out of causes beyond your control and without fault or negligence on your part." Subsequent to the termination, the Government awarded two contracts for a substitute mechanized materials handling system that did not include all of the DISARS–type capabilities. The Government incurred no excess reprocurement costs, and makes no claim for such against CBSI.

The Government's right to terminate a contract for default is assured by regulation and by contract provision. It is a remedy available to the Government that has long been recognized and accorded effect in both construction contracts and supply contracts. *National Surety Corp. v. United States*, 102 Ct.Cl. 671 (1944); *Universal Fiberglass Corp. v. United States*, 537 F.2d 393, 210 Ct.Cl. 206 (1976).

■ Termination for default, however, is a drastic adjustment of the contractual relationship and the Government is held to strict accountability in using this sanction. *J.D. Hedin Constr. Co. v. United States*,

408 F.2d 424, 431, 187 Ct.Cl. 45 (1969); *Schlesinger v. United States,* 390 F.2d 702, 709, 182 Ct.Cl. 571 (1968). A termination for default generally results in lost time to the Government in obtaining the services or goods it sought; it always penalizes the contractor, and frequently the Government is exposed to substantial additional costs, particularly if the action subsequently is found to be one for convenience of the Government. Further, a default termination is an acknowledgment that previous procedural safeguards—*i.e.,* bidding and negotiation procedures to select a contractor, examinations to determine contractor competence and qualifications, and review and approval of subcontract and subcontractors—have failed to realize their purposes.

Paragraph (e) of the default clause provides that, if after notice of termination for default, it is determined for any reason that the contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the notice of termination had been issued for the convenience of the Government. In the absence of paragraph (e), a wrongful termination for default is a breach, and some fault on the contractor's side does not bar a recovery for breach. *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692, 721 (1964). The Government in applying the default clause assumes the risk of having the default termination being converted to a convenience termination if the Government is wrong. If the Government is unsure of its position, it may seek information through a cure notice. When the Government actually issues the termination notice, however, it runs the risk of being wrong.

■ The board's decision that the default termination was improper as to the area of the contract involving the MOWASP interface, and that CBSI is entitled to recover costs associated with its attempts to comply with the MOWASP interface requirements, was based on cases that permit relief in circumstances where the defaulted contractor was not without fault or negligence, but the default was wrongful because of the Government's previous fault or negligence. *Laka Tool & Stamping Co. v. United States,* 639 F.2d 738, 226 Ct.Cl. 83 (1980) *reh'g denied,* 650 F.2d 270, 227 Ct.Cl. 468, *cert. denied,* 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 622 (1981); *Dynalectron Corp. (Pacific Div.) v. United States,* 518 F.2d 594, 207 Ct.Cl. 349 (1975). In both of these cases the Government's previous fault was the fact that it issued specifications that were impossible to perform; in each, the contractor was not without fault or negligence, and so was not entitled to compensation under the termination for convenience clauses; in each, relief was afforded but the measure of damages was based on common law or equitable principles, outside the terms of the contracts. A contractor that is not without fault or negligence, and thus is not eligible for a settlement by the convenience termination formula, does not wholly forfeit an otherwise valid claim. *Dynalectron Corp. (Pacific Div.) v. United States,* 518 F.2d at 604.

As the board found, CBSI clearly did not deliver on the due date, July 10, 1980, the hardware for a mechanized material handling system at the two DGSC warehouses in Richmond. Nor, on that date, did CBSI deliver the software that was necessary to allow the hardware to function with DISARS capability. This was a fixed price supply contract on standard forms, and the agreed upon due dates had not been extended by agreement. Time is of the essence in a supply contract that contains fixed dates for performance. When a contractor fails to make timely delivery, the Government's right to terminate a normal supply contract for default under paragraph (a)(i) routinely would be recognized, and that would be the end of the matter. This contract, however, is not the normal supply contract.

The contract was a component of a continuing program in DLA to improve materials handling procedures in its warehouses. The MOWASP system had been in use in DLA depots since 1965. DISARS at DGSC was to be a model for use in other facilities. When the contract was awarded, and throughout performance, the building of the mechanized hardware and the computer

hardware, as well as the production of the computer software, were not seen by the technical personnel of either party as tasks that involved legal concepts of factual impossibility or commercial impracticality. Production of forklift trucks, modified to permit elevation of the operator's platform, and equipped with a computer that consisted of a CRT, keyboard, printer, and a microprocessor, which were tied in with the CPU, and DRTs with keyboards and display screens, in 1978–80 were not viewed as involving esoteric or abnormal problems, either as to the mechanical equipment or as to the computer hardware and software.

Even the MOWASP interface problems, which the board characterized as rendering performance "impracticable if not impossible" were not seen as involving techniques beyond the state of the art. Impossibility or commercial impracticability, in the contract sense, were not matters of concern to the technicians on either side. As the contract work proceeded, production of an on-line interface with MOWASP was recognized as not being cost effective. The on-line MOWASP interface as developed by DGSC was viewed by DSAC as conceptually unsound, and by the chief of the Systems Division of DLA Headquarters, to be undesirable because it was a difficult and time consuming effort to both develop and maintain in a rapidly changing environment. The CO and DGSC's commander agreed to accept a DISARS without an on-line MOWASP interface because, even without an on-line interface, a DISARS capability would improve productivity at DGSC. They estimated only three additional personnel, plus one CRT and one printer, would be required to perform MOWASP update transactions.

The Government's delinquency in connection with the contract and DISARS specifications, and CBSI's failure to make timely delivery, are not attributable to concepts of factual impossibility or to commercial impracticality. Government fault, the existence of which was recognized by the board as to the MOWASP interface area of the contract, is found in the gestation of a contract without a technical review of user needs at warehouses 59 and 66, delays in establishing the Government's position on the meaning of contract terms until 20 months of a 24 month delivery period had elapsed, and a blindly legalistic determination to adhere to a contract schedule at a time when all responsible Government representatives recognized CBSI could not deliver.

This contract is abnormal as a fixed price production contract in solicitation procedures that began as an IFB and concluded with negotiations with the sole respondent to an RFP. The negotiations, which were mutual, continued IFB concepts for price and delivery, produced an instrument with a schedule that was ambiguous as to the work expected and a delivery schedule that did not recognize sequencing of intermediate phases in the CLINs. Of more importance, the DISARS specification, dated October 12, 1976, and amended June 24, 1978, was a performance specification aimed at end results that required the contractor to install an operating warehousing system. The specification included numerous errors and ambiguities as to what was required to be done in order to build, provide software, and install the DISARS. The CO issued Mod 2, Mod 3 and Mod 6 to clarify the DISARS specification. These clarifications by contract amendments would not have been necessary if, before award, the negotiators from DLA and CBSI had made a technical review of the amended specification against the DISARS requirements for warehouses 59 and 66 at DGSC.

The Government's disarray as to what was involved in production of the required software for the MOWASP interface is demonstrated by the production of the Fact Sheets. Thirty-eight were generated by DSAC and DGSC between December 1978 and March 1979. Before the Fact Sheets were developed, the Government was not fully aware of its own position as to the details of the work required to produce software for the MOWASP interface.

Fact sheets were the mechanism through which DSAC and DGSC personnel defined the functions, operations, and formats for the interface which the Government believed was required for DISARS. The Fact

Sheets addressed points of interface. Their provisions, however, were not exclusively concerned with interface problems, and they affected elements of software that were essential to an operational DISARS at warehouses 59 and 66.

From the beginning of its discussions of the Fact Sheets with Government personnel, CBSI contended that some of the requirements were beyond the scope of the contract, that the Fact Sheets provided information only, and that they did not require CBSI to program DISARS according thereto. In discussions in February 1979, major areas of controversy were identified. The Government asserted that the contract called for full MOWASP on-line interface teleprocessing of all functions, *e.g.*, receiving and issuing. CBSI contended the contract did not require the interface to receive all receiving functions. In discussions on April 10 and 11, 1979, of DISARS software, CBSI presented its general approach to software design and the definition of "Mode II" rewarehousing tasks. With respect to the latter, the Government advised that all of the requirements of Fact Sheet 4 must be included to support any type of receiving operations performed by DISARS; CBSI disagreed that this was a contract requirement and stated that it was not planning to proceed in that manner.

In discussions of Fact Sheet 3 (stow actions for material transferred to the "preservation, palletizing, packing, packaging, and marking" (PPPP & M) area) and Fact Sheet 37 (handling of PPPP & M material), CBSI's position was that those fact sheets were not within the contract requirements. The Government, however, believed that they were valid and essential requirements for operation of the PPPP & M function. The parties agreed that a contract decision was necessary to resolve these matters.

On April 25, 1979, CBSI determined that, rather than program the software in accord with the Government's Fact Sheets, it would submit its approach to the design of the system, and its monthly software reports, and allow DGSC to respond and pinpoint any disputes in the contractual requirements. On June 14 and 15, 1979, at CBSI's request, a meeting was held to address software. CBSI stated the agenda of the meeting by dividing the Government's Fact Sheets into four categories: (1) those with no impact upon software, (2) those CBSI would implement entirely, (3) those CBSI would implement only in part, and (4) those which CBSI did not intend to implement, believing them to be beyond the scope of the contract. At the meeting, the parties were able to resolve any controversy regarding Fact Sheets in the first two categories. Certain modifications were agreed to concerning the third category, and the remaining Fact Sheets in the fourth category remained unresolved. The Government's project officer believed a resolution of the parties' disputes over Fact Sheets in a timely manner was essential to facilitating CBSI's software design and programming; he requested the CO to review the disputed Fact Sheets.

The Fact Sheet controversy continued without resolution in summit meetings on August 14, and on September 17 to 19, 1979. During this period, DGSC's commander was concerned that software for rewarehousing functions be completed because a DESC depot in Dayton, Ohio, was being closed, with the material to be transferred to DGSC in Richmond. CBSI focused on programming for the work in rewarehousing, which did not involve either the disputed Fact Sheets or the MOWASP on-line interface. The parties' technical representatives reached agreement on the rewarehousing concept and flow charts. The parties noted, however, that they did not have an agreed upon functional/operational concept of "receiving" functions.

At the September 1979 summit meeting, the Government was concerned about CBSI's software development for rewarehousing operations and, because of the desire to utilize DISARS for materials coming from the DESC transfer, software development for receiving operations. Rewarehousing software was reviewed and the parties identified three possible alternatives: (1) full receiving, involving full interface with MOWASP; (2) use of "529" cards, during receiving, which involved making changes in MOWASP; and (3) con-

ditional receiving in which MOWASP transactions would be performed by DGSC outside of the DISARS system.

These discussions reveal the extent the impact of the Fact Sheets controversy and interface problems had on other DISARS operations at the warehouses. It was this impasse that generated DLA Headquarters' demand for a "baseline" interface document to be prepared by DGSC, and approved by DLA Headquarters, before any further negotiations were taken with CBSI on interface problems.

Until DLA Headquarters reached its decision on the baseline interface document on March 11, 1980, the DGSC and DSAC negotiators did not know what work was involved in the specification requirement that DISARS interface the DLA computer systems. At that time, the Fact Sheet controversies as to elements of DISARS computer software essential to the work in warehouses 59 and 66 remained unresolved. These controversies were continuing at the time the CO issued Mod 6 on March 11, 1980, and were outstanding after Mod 6 was amended by the April 11 and April 24, 1980, correspondence between CBSI and the CO. In Mod 6, the CO incorporated the Government's position on all unresolved Fact Sheet disputes.

Mod 6 was a unilateral change order that made changes in the DISARS specification in 33 numbered paragraphs. Mod 6, paragraph (2), provides "Change all references to DSA Form 529 in the DISARS Contract Specification to F–200, F–201 and F–202 reports." New form F–201 Contract Data Sheet, contained some elements not found in the prior Form 529. Form 529 had been used by CBSI for receiving information (*i.e.*, information on incoming material). The Government announced at a meeting on September 14, 1978, that DLA F–529 for receiving information would no longer be used. The contract specification, in Section II, pages 2–6, Paragraph B, captioned DISARS System Operation Description, addressed the ability of the DISARS DISC to receive data. As written, Paragraph B was modified by the parenthetical phrase "(presently the data comprising Form

529)." Mod 6 changed the parenthetical to "(presently the data comprising the F–200, F–201 and F–202*)." At the September 1978 meeting, the Government argued that the contract's description of receiving data as *"presently* the data comprising Form 529" (emphasis supplied) permitted such a change. CBSI did not agree. This change was included in the amendment to Mod 6 that allowed a waiver of the due date as to the interface. This change is substantive and it also involves DISARS basic software that is in addition to the interface dispute.

CBSI responded to Mod 6 by a letter from its president to the DGSC commander and a letter from its director of contracts to the CO. Both letters were dated April 11, 1980, and both letters requested authorization from the CO to delay implementation of Mod 6 until after delivery of the operational DISARS package. In the absence of an amendment to Mod 6, CBSI's president estimated that delivery of any system would be delayed 6 to 12 months, and CBSI's director of contracts estimated that the impact would be in excess of a million dollars, with an additional delivery period of at least 6 months.

CBSI's director of contracts gave formal notice to the CO that, pursuant to the changes clause, "CBSI is intending to file a claim for an equitable adjustment for the additional work required by Modification P0006." The letter also states:

> Since the majority of the substantive impact of Modification P0006 is related to the MOWASP interfacing efforts, CBSI intended to delay implementation efforts on those areas until after delivery of the fundamental DISARS system.

CBSI's director of contracts pointed to ambiguities in paragraphs (2) and (17) of Mod 6 and stated "These are but two examples of the several problems of interpretations we have encountered in attempting to assess the impact of the Modification." The letter concludes with a request that the CO approve a delay in the submission of a claim under the changes clause.

The CO's reply on April 24, 1980, explained the change order was issued "to clarify or delete ambiguous language in the

DISARS specification." Mod 6, according to the letter, "does not enlarge the scope or complexity of the software for the DISARS."

The CO's letter discussed CBSI's contentions that paragraphs (2) and (17) of Mod 6 were ambiguous, noted that these questions had been the subject of many discussions, and stated the Government stands ready to further discuss them at any mutually convenient time. The CO's letter includes the following paragraph:

If the contractor believes there are other fundamental ambiguities contained in the changes incorporated into the contract by Modification P00006, the contractor should identify them to the contracting officer, within ten days after receipt of this letter. If indeed, ambiguities are found to exist in the DISARS specifications, immediate action to resolve them with the contractor will be initiated by the contracting officer. It is not desired that performance of the contract be endangered or the 10 July 1980 DISARS capability date be placed in jeopardy under any avoidable circumstance. The contractor also mentions that it is having some difficulty in interpretation of the changes. This problem should also be specifically addressed in your reply to this letter.

The letter stated the CO had made an in depth review of the changes to the DISARS specification to avoid any adverse impact on the July 10, 1980, DISARS capability date. This review analyzed the changes in three categories: (a) changes mutually agreed to (16 paragraphs); (b) changes not concurred in by CBSI, but were changes the Government made to clarify the specification, and "should not impact the realizations of DISARS capability" by July 10 (3 paragraphs); and (c) changes that affect either "Teleprocessing Interface or Tape Interface with MOW-ASP" (9 paragraphs).

With respect to category (c), the letter stated CBSI could delay implementation of the changes "to a mutually acceptable date" if the changes will impact the realization of DISARS capability by July 10, 1980.

Category (c) included paragraph (2) of Mod 6. This change was substantial, and the references regarding receiving data from DLA Form 529 to F–200, F–201, and F–202 reports were substantive changes.

With respect to negotiations for an equitable adjustment, the CO concluded with the following paragraph:

The contractor has also stated that it intends to file a claim for an equitable adjustment for the additional work required by change order Modification P00006. Since the modification is a change order issued pursuant to the changes clause of the contract, *the contractor does have the right to submit a claim for any additional work required.* However, our review of these changes causes us to believe that most of the changes will not cause increased performance costs. The Government has no objection to your delaying submission *of any claim until all changes have been implemented.* Any claim, if submitted, will of course be subject to an audit by the Defense Contract Audit Agency before a contracting officer's decision will be made to either negotiate or reject the claim. [Emphasis supplied.]

On April 25, 1980, the DGSC commander acknowledged CBSI's president's April 11 letter, and urged him to "press on to meet the 10 Jul 80 DISARS operation date" and that he was "still looking forward to toasting DISARS capability with you on 10 Jul 80!"

On May 12, 1980, CBSI's director of contracts responded to the CO's April 24, 1980, request. In explanation as to why he had not responded in 10 days time, CBSI's director of contracts stated a full response to the CO's inquiries would require the efforts of "key individuals working on critical path items relating to the early system delivery," and that preparation of a response at this time would be contrary to the CO's priorities. With respect to the substance of the Mod 6 changes, CBSI's letter observed:

We note, furthermore, your assertion that you believe the changes to be minor in scope. That is very potently a matter

for future resolution. We can only advise you that we have not yet undertaken a full analysis of the changes, but do anticipate they may be substantial in impact.

From the foregoing, it is clear that Mod 6 made changes in the contract software specifications that were essential to installation of an operational DISARS at warehouses 59 and 66. These matters were in dispute at the time the CO gave notice of the default termination on August 1, 1980, and under the changes clause, CBSI was entitled to negotiate adjustments in price or delivery schedule. Accordingly, as a matter of law, the ASBCA decision was in error to the extent it approved a default termination "for failure to develop the DISARS–capable software (wholly apart from the interface controversy)."

### CONCLUSION

There are pending before the ASBCA default related claims by the Government, and an appeal by CBSI based on claims for termination for convenience. These proceedings have been held in abeyance pending the outcome of the default issue in this case, which has been limited to a decision as to what areas of the contract, if any, in which a termination for default was proper. The sole decision in this case is that the default termination as to contract area (2), as defined by the board in its decision, was unlawful.

The board identified subitem CLINs that the Government had accepted and paid for prior to, and subsequent to, termination, items for which acceptance had been withdrawn, and additional items accepted. In further proceedings before the board, the Government's default related claims and CBSI's convenience termination claims require reexamination to give effect to the decision that the default termination was proper only as to contract area (1), system hardware. CBSI's entitlement to adjustments for work in contract areas (2) and (3) may not be decided on principles that apply to a default termination.

Defendant's motion for summary judgment in support of the ASBCA decision is allowed in part and denied in part. Plaintiff's motion for summary judgment in opposition to the ASBCA decision is allowed in part and denied in part. This case is remanded to the ASBCA for further proceedings in accordance with this opinion.